**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2249-17T2

MARA OLIVA,

     Plaintiff-Appellant,

v.

SAINT JOSEPH'S REGIONAL
MEDICAL CENTER, a corporation
or business organization, NARINE
KAPRELIAN, individually, and/or
as agent, servant, or employee of
SAINT JOSEPH'S REGIONAL
MEDICAL CENTER, and TINA
MILES, individually, and/or as agent,
servant, or employee of SAINT JOSEPH'S
REGIONAL MEDICAL CENTER,

     Defendants-Respondents.

_____

Submitted March 19, 2019 – Decided May 16, 2019

Before Judges Rothstadt, Gilson and Natali.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-9920-15.

Mara Oliva, appellant pro se.

Jackson Lewis PC, attorneys for respondents (Ronald V. Sgambati, of counsel and on the brief; Robert J. Cino, on the brief).

PER CURIAM

Plaintiff Mara Oliva filed a complaint against her former employer, St. Joseph's Regional Medical Center (St. Joseph's)[1], and two supervisors, alleging defendants terminated her employment in violation of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14. After the completion of discovery, the trial court granted summary judgment to defendants. Plaintiff appeals from an October 10, 2017 order granting summary judgment and a December 1, 2017 order denying her motion for reconsideration. Plaintiff did not establish a prima facie case of a CEPA violation. Accordingly, we affirm.

I.

We discern the facts from the summary judgment record, viewing them in the light most favorable to plaintiff, the non-moving party. See Globe Motor Co. v. Igdalev, 225 N.J. 469, 479-80 (2016) (citing R. 4:46-2(c)).

---

[1] According to defendants' brief, St. Joseph's Regional Medical Center was incorrectly pled as Saint Joseph's Regional Medical Center.

Plaintiff worked for St. Joseph's from 2008 until 2015. She was first hired as a Psychiatric Emergency Services (PES) clinician. In 2012, she was promoted to the position of Certified Screener, which she held until her termination in August 2015. As a screener, plaintiff interviewed patients to evaluate whether they needed to be admitted for involuntary psychiatric treatment. Before a patient could be committed involuntarily, a number of procedures had to be followed as required by New Jersey law, regulations, and court rules. See, e.g., N.J.S.A. 30:4-27.5 and 27.9; N.J.A.C. 10:31-2.3; R. 4:74-7. Moreover, St. Joseph's had its own internal policy governing commitments, which supplemented the requirements imposed by the State.

On Tuesday, July 14, 2015, plaintiff sent an email to her manager, Tina Miles, which thanked her for approving a vacation request and raised an issue concerning plaintiff's supervisor, Narine Kaprelian. As to the issue with Kaprelian, the email stated:

> I would like to mention in this email, that I have observed lately that Narine is pushing (me) to write reports of evaluations before having the case reviewed with the psychiatrist and having a final disposition. I understand that sometimes [the Emergency Room] is busy and she wants to rush cases, but if we are unable to contact the psychiatrist immediately, or [the psychiatrist] is busy with other cases, unfortunately the cases will have to wait until being able to be completed

since I do not feel comfortable writing a report when there is no[] disposition available.

The next day, Miles sent a reply email to plaintiff explaining that a screener can complete part of an evaluation before talking with the psychiatrist. Miles stated:

> In regards to writing eval[uation]s prior to talking with the [p]sychiatrist, I think that part of the eval[uation] can always be completed. I know that when we are busy during the day and see [patients] quickly, I tell staff to complete everything up [to] the diagnosis, recommendation, and integration summary until you have the chance to speak with the psychiatrist. That way, once you do finally speak with them, there is not too much to complete. I know that many times on the evening shift staff is waiting for [the psychiatrist] to come in . . . so this can expedite the process. Many times eval[uation]s are done over a period of time, and we don't have to have it typed out all at the same time. This also shows that we are continually working with that patient and documenting information.
>
> Please let me know if you have any questions.

Thereafter, plaintiff and Miles had no further communication regarding plaintiff's complaint about Kaprelian's instructions for completing evaluation reports. Moreover, Miles testified that she never forwarded plaintiff's email to Kaprelian because she did not think that Kaprelian was doing anything wrong. Kaprelian testified that she was not aware of plaintiff's complaint to Miles until plaintiff sued her in November 2015.

A-2249-17T2

On July 16, 2015, plaintiff began her regular shift at St. Joseph's at 5 p.m. At approximately 8 p.m., Kaprelian telephoned the PES office, where plaintiff was working, to assign her a patient. Kaprelian was unable to reach plaintiff. She explained that she made "multiple calls" to the office where plaintiff was assigned and called the station where another screener was assigned to ask if they had seen plaintiff.

At approximately 9 p.m., two other screeners, J.M. and K.H.,[2] informed Kaprelian that they had observed plaintiff sleeping. At their depositions and in their certifications, J.M. and K.H. confirmed that they had observed plaintiff sleeping in the PES office on July 16, 2015, and that they reported that information to Kaprelian.

Later that evening, at 10:03 p.m., Kaprelian emailed Miles and another St. Joseph's employee to report that plaintiff had been sleeping while at work. In her email, Kaprelian explained she had been attempting to contact plaintiff for ninety minutes to assign her a case. She had called the PES office multiple times, but there was no answer, and eventually she assigned the case intended for plaintiff to a different clinician "because it was taking too long . . . to find her."

---

[2] We refer to certain individuals by their initials in order to protect their privacy.

A-2249-17T2

Kaprelian also stated that at about 9:25 p.m., she called the PES office on a different matter and plaintiff answered the phone. Kaprelian reported that she asked plaintiff where she had been for the past ninety minutes, and plaintiff responded: "What are you talking about? I have been in the office the whole time." In her email to Miles, Kaprelian explained that she spoke with J.M., who informed her that plaintiff had been in the PES office sleeping.

Five days later, on July 21, 2015, Miles contacted plaintiff to inform her that she was suspended pending an internal investigation by human resources. That same day, human resources began its investigation. That investigation was conducted by Employee Relations Manager L.S. As part of her investigation, L.S. conducted a series of interviews, including interviewing plaintiff.

By July 30, 2015, L.S. had completed her investigation. On that date, she sent an email to the St. Joseph's Vice President of Human Resources explaining that she was "recommending termination for [plaintiff] . . . for sleeping on the job." She noted that she had "met with [plaintiff] and also spoken to four other employees, two of [whom] witnessed [plaintiff] sleeping on that day July 16th." She explained that plaintiff denied the allegations, however, on the night at issue, plaintiff's supervisor was unable to contact plaintiff and, thus, could not assign her a patient to evaluate. L.S. also documented that she had collected

6

plaintiff's "ID Badge Report and . . . video footage which refutes [plaintiff's] explanation that she was in the [Emergency Department] during the time in which she was being sought by [Kaprelian]."

On August 3, 2015, Miles and another St. Joseph's employee met with plaintiff to discuss the human resources investigation. During that meeting, Miles informed plaintiff that the investigation had revealed a witness who observed plaintiff sleeping while at work. Miles then informed plaintiff she was being terminated. Thereafter, in a letter dated August 5, 2015, Miles confirmed that plaintiff's employment was terminated because she had slept on the job.

On November 12, 2015, plaintiff filed a complaint against defendants alleging retaliation and wrongful termination in violation of CEPA. Specifically, plaintiff alleged that she was terminated for complaining that Kaprelian had been pressuring her "to complete her mental health evaluations without consulting with the staff psychiatrist for final disposition," which plaintiff had objected to in her July 14, 2015 email to Miles.

The parties then engaged in discovery, which included depositions of plaintiff, Miles, Kaprelian, and L.S. At the close of discovery, defendants moved for summary judgment.

A-2249-17T2

The motion court heard oral argument and, on October 10, 2017, it issued an order and written decision granting defendants' motion for summary judgment and dismissing plaintiff's complaint with prejudice. In granting summary judgment to defendants, the court focused on CEPA's requirement that plaintiff reasonably believed that her employer's conduct violated a law, rule, or regulation. The court noted that in opposing summary judgment, plaintiff contended that certain statutes and regulations required a screener to consult with a psychiatrist before completing the screener's recommendation. Specifically, plaintiff pointed to N.J.S.A. 30:4-27.1 to -27.5 and Rule 4:74-7. The court analyzed those statutes and the rule and concluded that neither the statutes nor the rule required a screener to consult with a psychiatrist before making the screener's recommendation. Instead, the court noted that the requirement plaintiff was relying on was set forth in an internal policy established by St. Joseph's. The court pointed out that an internal policy does not constitute a law, rule, or regulation for purposes of CEPA. Accordingly, the court granted summary judgment because plaintiff had not demonstrated "a substantial nexus between the complained of conduct" and a law, regulation, or public policy. The court also found that plaintiff's belief that a violation had occurred was not objectively reasonable.

8

Plaintiff moved for reconsideration, which the court denied after hearing oral argument. In its oral decision placed on the record on December 1, 2017, the court considered and rejected plaintiff's arguments as to N.J.S.A. 30:4-27.5 and Rule 4:74-7, finding plaintiff was presenting the same arguments she previously presented at summary judgment, and thus, was not entitled to reconsideration. The court also considered two new regulations that plaintiff argued she reasonably believed Kaprelian's conduct had violated. Specifically, plaintiff directed the court to N.J.A.C. 13:35-6.5(b) and N.J.A.C. 10:31-2.3(j). The court analyzed both regulations and determined those regulations did "not indicate that Kaprelian's instructions were illegal." Thereafter, the court found "there is no rule, regulation, or statute that was violated in this case." After granting plaintiff the benefit of all legitimate inferences, the court concluded that she had only shown an objectively reasonable belief that "one or more members of the hospital staff did not follow [St. Joseph's] internal policy."

II.

Plaintiff now appeals from the October 10, 2017 order granting summary judgment to defendants, and the December 1, 2017 order denying reconsideration. She argues the motion court erred in granting summary judgment to defendants because she established a prima facie claim of a CEPA

9

violation. Specifically, she contends that the court misunderstood the requirements for bringing a claim under CEPA, and that its misunderstanding led it to grant summary judgment to defendants. Moreover, she argues that the court failed to view the facts in the light most favorable to her and, thus, failed to recognize genuine disputes as to material facts.

We review a grant of summary judgment using the same standard that governs the motion court's decision. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018) (citing Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). Under that standard, summary judgment will be granted when "the competent evidential materials submitted by the parties," viewed in the light most favorable to the non-moving party, show that there are no "genuine issues of material fact" and that "the moving party is entitled to summary judgment as a matter of law." Grande v. Saint Clare's Health Sys., 230 N.J. 1, 23-24 (2017) (quoting Bhagat, 217 N.J. at 38); accord R. 4:46-2(c). "An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Id. at 24 (quoting R. 4:46-2(c)). We owe no special deference to the motion

court's legal analysis or its interpretation of a statute. RSI Bank, 234 N.J. at 472; Hitesman v. Bridgeway, Inc., 218 N.J. 8, 26 (2014).

CEPA is a remedial statute that promotes the public policy of New Jersey to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." Hitesman, 218 N.J. at 27 (first quoting Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 555 (2013); then quoting Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003)). Accordingly, the statute "shields an employee who objects to, or reports, employer conduct that the employee reasonably believes to contravene the legal and ethical standards that govern the employer's activities." Ibid. See also N.J.S.A. 34:19-3(a) and (c).

To demonstrate a prima facie CEPA violation, a plaintiff must establish:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c);
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

> [Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015)
> (quoting Dzwonar, 177 N.J. at 462); accord Puglia v.
> Elk Pipel)ine, Inc., 226 N.J. 258, 280 (2016).]

"[T]he court decides, as a matter of law, whether or not a plaintiff has carried his or her burden of demonstrating the elements of [a] prima facie case[.]" Tartaglia v. UBS PaineWebber Inc., 197 N.J. 81, 125 (2008).

In evaluating whether a CEPA plaintiff has offered sufficient evidence to prove his or her claim, New Jersey courts apply the three-step burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Winters v. N. Hudson Reg'l Fire & Rescue, 212 N.J. 67, 90 (2012) (citing Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97 (1990)). Under that framework, once the plaintiff has satisfied her or his initial burden of showing the elements of a prima facie case,

> [t]he burden of production then shifts "to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. Once the employer does so, "the presumption of retaliatory discharge created by the prima facie case disappears and the burden shifts back to the [employee]." At that point, the employee must convince the fact finder that the employer's reason was false "and that [retaliation] was the real reason." The ultimate burden of proof remains with the employee.
>
> [Ibid. (second and third alterations in original) (citations omitted) (first quoting McDonnell Douglas Corp., 411 U.S. at 802; and then quoting Blackburn v.

United Parcel Serv., Inc., 179 F.3d 81, 92 (3d Cir. 1999)).]

Here, plaintiff's claim fails because she had no evidence to support the fourth prong needed to establish a prima facie case under CEPA. In other words, she made no causal connection between her complaint about Kaprelian and her termination. In her complaint, and at her deposition, plaintiff identified her whistleblower activity as objecting to Kaprelian pressuring her to complete her evaluations before speaking with a psychiatrist. In that regard, she stated she made that complaint in an email she sent to Miles on July 14, 2015.

Miles testified that she never forwarded plaintiff's July 14, 2015 email to Kaprelian because she considered it a "non-issue" since, in Miles' view, Kaprelian "wasn't doing anything wrong." Moreover, Miles pointed out at her deposition that she had responded to plaintiff and had taken the position that Kaprelian was acting appropriately. Accordingly, Miles testified that she did not communicate with Kaprelian regarding the contents of plaintiff's email. Miles also testified that after sending her response email to plaintiff, plaintiff never raised any questions and, therefore, Miles thought the issue had been resolved.

At her deposition, Kaprelian testified that Miles did not relay plaintiff's complaint to her and that she was not aware of the complaint until plaintiff filed

her lawsuit, which was well after Kaprelian reported plaintiff for sleeping while at work and well after plaintiff had been fired. Moreover, the adverse employment action in this case—plaintiff's termination—only occurred after human resources conducted an investigation. Kaprelian testified that she was not involved in the human resources investigation beyond providing the initial report that plaintiff had been sleeping at work. Likewise, Miles testified that she did not participate in the human resources investigation beyond providing requested documentation. Furthermore, both Kaprelian and Miles testified that they had not been involved in the decision to terminate plaintiff. Consequently, after completing discovery, plaintiff had no evidence showing a causal connection existed between her whistleblowing activity and her termination.

On this appeal, plaintiff argues that the trial court incorrectly granted summary judgment because it found there had been no violation of a law, rule, or regulation. Plaintiff contends that the correct focus is on whether she reasonably believed that her employer's conduct was violating a law, rule, or regulation. Because we conclude that plaintiff cannot establish the fourth prong of the prima facie showing of a CEPA violation, we need not reach that issue. See Shim v. Rutgers, 191 N.J. 374, 378 (2007); State v. Williams, 444 N.J. Super. 603, 617 (App. Div. 2016) ("It is well-established that a reviewing court

14

can affirm a decision on different grounds than those authorities offered by the court being reviewed.").

We do point out, however, that plaintiff has changed her position concerning what law, rule, or regulation she reasonably believed was being violated. On the initial summary judgment motion, plaintiff argued that she believed Kaprelian had violated N.J.S.A. 30:4-27.5 and Rule 4:74-7. Thereafter, on her motion for reconsideration, plaintiff argued that she reasonably believed that Kaprelian had pressured her to violate N.J.S.A. 30:4-27.5, Rule 4:74-7, N.J.A.C. 13:35-6.5(b), and N.J.A.C. 10:31-2.3(j).

Before us, plaintiff does not argue that any of those statutes were violated or that she reasonably believed they were being violated; rather, she relies on two new statutes: N.J.S.A. 2C:21-4.1, which makes it a fourth-degree crime to purposefully falsify a medical record, and N.J.S.A. 30:4-27.9(c), which limits involuntary commitment to seventy-two hours without a temporary court order. We decline to consider these new arguments because they were not properly presented to the trial court. See Correa v. Grossi, ___ N.J. Super. ___, ___ n.2 (App. Div. 2019) (slip op. at 4); State v. Robinson, 200 N.J. 1, 20 (2009) ("[A]ppellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is

available unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest." (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)). Here, plaintiff is not raising a matter of great public interest that would warrant our review of her new arguments.

Finally, we also affirm the summary judgment in favor of defendants because plaintiff cannot survive the burden-shifting paradigm under CEPA. Even if plaintiff had presented a prima facie showing of a CEPA violation, St. Joseph's articulated a legitimate non-discriminatory reason for plaintiff's termination. In that regard, St. Joseph's presented evidence that plaintiff was fired because she was sleeping while at work. A review of the summary judgment record establishes that plaintiff did not and could not raise a genuine issue of material fact that her termination for sleeping while at work was pretextual. She presented no evidence showing Kaprelian knew of the July 14, 2015 complaint plaintiff made to Miles. Moreover, plaintiff presented no evidence that the investigation conducted by human resources was not legitimate. L.S. testified at her deposition that she based her recommendation to terminate plaintiff on statements made by two employees who had observed plaintiff sleeping, phone call logs showing Kaprelian had repeatedly called the PES office where plaintiff was assigned, and security video footage that

independently verified plaintiff was not in the emergency department where she claims she was when Kaprelian was looking for her.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2249-17T2